621 F.Supp. 880 (1985)
NATIONAL FOOTBALL LEAGUE and St. Louis Football Cardinals, Inc., Plaintiffs,
v.
McBEE & BRUNO'S, Jerrald Guttmann, Michael Badalamenti, Frank & Frank, Inc. and Talayna's of South St. Louis Inc., Defendants.
No. 84-2692 C (5).
United States District Court, E.D. Missouri, E.D.
October 2, 1985.
Order September 13, 1985.
*881 *882 Robert E. Wallace, Jr., Jim J. Shoemake, David W. Harlan, Guilfoil, Petzall & Shoemake, St. Louis, Mo., John Vanderstar, Margaret Alexander, Covington & Burling, Washington, D.C., for plaintiffs.
Barry S. Ginsburg, Clayton, Mo., John L. Sullivan, Joanna O. Quinley, Francis M. Nevins, Jr., St. Louis, Mo., for defendants.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
This civil case, in which injunctive relief is requested, is now before the Court on the merits and the parties have exhaustively briefed and argued the issues. Plaintiffs, in alternate theories, claim defendants have no authority to intercept transmissions of live telecasts of professional football games played in St. Louis, Missouri between the Cardinals and other National Football League teams and show such telecasts at their restaurant or tavern establishments. Plaintiffs allege defendants violate plaintiff's copyright authority, 17 U.S.C. § 101, et seq., and violate, as well, certain provisions of the Federal Communications Act of 1934, as amended. 47 U.S.C. § 151, et seq. Plaintiffs request permanent injunctive relief and statutory damages under the Copyright Act. Plaintiffs also assert contempt claims against some defendants for alleged violation of the Court's preliminary order.
Defendants deny any violation of either act and assert numerous affirmative defenses. In addition, they claim damages are due from plaintiffs in a variety of counterclaims.
Trial and a decision on the issues presented by the counterclaims and the contempt assertions are reserved and will not now be dealt with.
On November 19, 1984, the Court entered a temporary restraining order, restraining defendants and their agents from intercepting from satellite, or from any other means, a transmission of a live telecast of the professional football game scheduled to be played in St. Louis, Missouri on November 25, 1984 between the Cardinals and the Philadelphia Eagles, the performance of which game was to be telecast on November 25, 1984 by CBS Sports, Inc.
After a hearing, the Court, on December 7, 1984, issued a preliminary injunction following the general terms of the temporary restraining order, except that another professional football game showing was also enjoined. This was the 1984 season final home game scheduled to be played between the Cardinals and the New York Giants, on December 9, 1984. The basis of the preliminary injunction was that defendants had infringed plaintiffs' copyrights in National Football League ("NFL") game programs and there was a reasonable likelihood defendants had violated the provisions of the Federal Communications Act, as well.
Although certain findings of fact were made in the preliminary injunction, many will again be restated or changed in view of *883 new testimony adduced at the trial on the merits.
Plaintiff National Football League is an unincorporated, non-profit association constituted under the laws of New York, with its principal place of business in New York City. The association is composed of 28 member clubs that are engaged in the business of exhibiting professional football games. The clubs are divided into the National Conference and the American Conference. Through the NFL, the member clubs schedule games against each other and manage their affairs as a league.
Plaintiff St. Louis Football Cardinals is a Missouri corporation organized under the laws of the state of Missouri, with its principal place of business at St. Louis, Missouri. The Cardinals is a member club of the National Football League and is a member of the National Conference.
Defendant McBee & Bruno's, Inc. ("Panama Reds") is a Missouri corporation that owns and operates Panama Reds, a bar and restaurant located at 2245-7 South Grand in St. Louis, Missouri 63104.
Defendant Frank & Frank, Inc. ("Sandrinas"), is a Missouri corporation that owns and operates Sandrina's, a bar and restaurant located at 5098 Arsenal in St. Louis, Missouri 63139.
Defendant Jerrald Guttmann ("Guttmanns") owns and operates, Guttmann's, a bar and restaurant located at 3609 Juanita in St. Louis, Missouri 63166.
Defendant Michael Badalamenti ("Mr. B's") owns and operates Mr. B's, a bar and restaurant located at 5800 Southwest Avenue in St. Louis, Missouri 63116.
Defendant Talaynas of South St. Louis, Inc. ("Talaynas") is a Missouri corporation that owns and operates Talaynas, a bar and restaurant located at 3123 Watson, in St. Louis, Missouri 63139.
Each defendant restaurant and bar is equipped with a satellite dish antenna capable of receiving satellite transmissions.
In 1982, the NFL, on behalf of the member clubs, entered into contracts with the three major networks, ABC, CBS and NBC, to provide for the telecasting of live television programs of NFL regular season and post-season games for five seasons commencing in the fall of 1982.
By these contracts, each network obtained exclusive rights to televise certain NFL games, subject to contractual limitations, among them the requirement that unsold out games are not to be broadcast live; that is, that they be blacked-out in the home club's home territory which is the area within a 75-mile radius of the club's home playing site. In addition, all of the clubs away games must be broadcast live back to the home city.
All of the defendants' establishments are located within 75 miles of Busch Stadium which is in the City of St. Louis, Missouri and is the home site of plaintiff St. Louis Football Cardinals.
These exclusive contracts, with their limitations on broadcast rights, serve the NFL and its member clubs' economic interests in controlling the distribution of the sports entertainment product that the clubs and the NFL create. The contract limitations also foster development of a local following for individual clubs.
The Cardinals played regularly scheduled home games at Busch Stadium during the 1984 season against other clubs including the Los Angeles Rams game on November 4, 1984, the Philadelphia Eagles game on November 25, 1984 and the New York Giants game on December 9, 1984. The Rams, Eagles and Giants' games were all telecast by CBS to other areas but were blacked out and not shown by the St. Louis CBS affiliate, KMOX TV in the greater St. Louis area.
Each of the Cardinals' home games are telecast following a regular process. Network cameras in the Stadium capture the video images of the game while the network announcers, team players and others simultaneously create the audio portions of the telecasts. The audio and video signals of the telecasts referred to, which constitute the program, are then transmitted to an earth station located outside the stadium. *884 The earth station then transmits the program to a satellite in geostationary earth orbit at a point on the celestial equator where the satellite is located.
A transponder on the satellite receives the signal and on another frequency transmits it to a network control point in Long Island, New York. This transmission is broad enough that it can be received, with proper equipment, in large portions of the earth in the vicinity of the satellite, including much of the United States. The signal from the earth station to the satellite is called an uplink and that going from the satellite to Long Island is a downlink. At this stage the downlink signal contains no commercials and is occasionally referred to as a clean feed.
On receipt of the clean feed down link at the network control point, the network inserts program material consisting largely of commercials and other sports commentary. The signal is then transmitted from the New York control point back to the original transmitting satellite or to a different satellite also in geostationary orbit. This uplink signal is referred to as a dirty feed because of the insertion of new materials. The dirty feed is then transmitted from the satellite to the same large portions of the earth in the vicinity of the satellite and is then received by the network's affiliated television stations and broadcast pursuant to the terms of the agreement between the networks and the NFL.
An uplink signal transmitted from an earth station to a satellite is a focused signal with strength directed toward the satellite. The downlink is more of a difused signal which permeates a large area. The satellite downlink signals, whether clean feeds or dirty feeds are transmitted in the so-called C-Band frequency consisting of 3,700 to 4,200 megahertz. Accordingly, downlink signals, intended for a network control point or authorized television stations, can be intercepted with equipment that is now available to the public such as dish antennaes. It is not possible for these transmissions to be intercepted by ordinary home television equipment.
Although satellite dish systems are becoming popular, they are not commonly used in private homes and their use is generally confined to commercial establishments such as hotels, bars and restaurants and to residential areas that are so situated that access to network television stations by standard television antennae is poor. A dish system can be purchased for $1,500.00 but the more sophisticated reliable systems cost much more. Defendants' systems cost as much as $3,000.00 to $6,000.00 each. There are 125 to 130 million residential television sets in the United States as compared to 1 million or less satellite dish systems.
All defendants have dish antennaes or earth stations capable of receiving either a clean or dirty feed downlink signal. By the use of this equipment, they can receive the signal and convert it to a frequency so that it can be displayed on television sets and viewing screens in their establishments. If the signal is that of the video and audio of a football game, that game can then be displayed by defendants to their customers.
On November 4, 1984, the Cardinals played the Los Angeles Rams in St. Louis and the game was blacked out. The satellite signal of that game was intercepted by all defendants, except Sandrinas, with the use of dish antennaes and shown to their bar and restaurant customers and friends. The signal intercepted was that of the clean feed downlink and viewers did not see commercials or other material added at the network control point. They did view the entire game and heard the simultaneous audio commentary of the sports commentators and announcers.
Sandrinas', with the use of a television antennae, was able to receive the full game and commercial insertions as broadcast by an affiliated CBS station on Channel 12, located in Cape Girardeau, Missouri, perhaps 100 or more miles away on a point to point measurement. Sandrinas', Mr. B's, Panama Reds' and Talaynas' all displayed the game so that food and beverage customers *885 could view it and hear the commentary.
Guttmanns' does not have a Sunday liquor sales license and its establishment was not open for business on Sunday, November 4, 1984. Guttmanns' did intercept the satellite signal on that date with its dish antennae and showed the game to four persons including the owner and three friends.
All defendants, except Guttmanns', derive income from increased business as a result of showing blacked out football games to their customers via the systems detailed. Apparently, many establishments in the greater St. Louis area, other than defendants, derive the same benefits from this practice. At the same time, when a game is blacked out, it is not sold out and the Cardinals lose income if there are unsold tickets. Broadcasts of live professional football home games to a home audience produce an extremely adverse affect on live attendance.
Ordinarily, an action for infringement of the copyright in any work cannot be instituted until registration of the copyright claim has been made following the provisions of 17 U.S.C. In the case of a work consisting of sounds, images or both, the first fixation which is made simultaneous with its transmission, the copyright owner may either before or after such fixation takes place, institute an action for infringement if the owner serves notice on the infringer, not less than ten or more than thirty days before such fixation, identifying the work and the specific time and source of its first transmission and declaring an intention to secure copyright in the work and makes registration for the work within three months after its first transmission. 17 U.S.C. § 411.
After the November 4, 1984, Cardinals-Rams game, plaintiffs applied for the temporary restraining order as to the November 25, 1984 Cardinal-Eagles game and the final home game of the Cardinals and Giants on December 9, 1984. Notice of potential infringement of the November 25th and December 9th games was timely given by plaintiffs to all defendants and proceedings to register the games for copyright purposes have been instituted as provided by the code requirements.
After a Cardinal football game video and audio program is transmitted to satellite and then sent to New York for commercials and other input and the resulting dirty feed is sent out for ultimate network broadcast, it is the dirty feed transmittal that is preserved for copyright registration purposes by plaintiffs. Neither plaintiffs nor the networks, authorized defendants at anytime to intercept plaintiffs' copyrighted football programs and use them for their own purposes.
This Court has jurisdiction of claims asserting violation of the Copyright Act and the Federal Communications Act. 28 U.S.C. § 1331.

Copyright Act
The telecasts, consisting of the video and audio commentary of Cardinal football games and commercials and other materials added thereto, are copyrightable within the meaning of the Copyright Act. The code specifically provides that copyright protection subsists in original works of authorship which includes "motion pictures and other audiovisual works." 17 U.S.C. § 102(a)(b); National Association of Broadcasters v. Copyright Royalty Tribunal, 675 F.2d 367, 378 (D.C.Cir.1982).
The N.F.L., on behalf of its member clubs and the Cardinals as to their games, are the owners of the copyrights of the games involved in this case. Such game programs were duly registered in the United States Copyright office and those registrations were valid and enforceable.
Defendants contend there was no infringement. All defendants, except Sandrinas' displayed for their customers the clean transmission rather than the dirty transmission. Defendants and their customers saw only the football game itself and the commentary thereon. At time-outs or at station breaks, the video was blank and the commercials and other materials *886 inserted then by the networks were not displayed. Had defendants intercepted the dirty signal, they too, would have seen and heard the commercials. As plaintiffs' copyrighted the dirty signal and defendants intercepted and displayed for their customers the clean signal only, defendants vigorously deny infringement.
As stated, copyright protection subsists in original "works" of authorship. 17 U.S.C. § 102(a). A work is created when it is fixed in a copy or phonograph record for the first time. A work consisting of sounds, images or both that are being transmitted is fixed if a fixation of the work is being made simultaneously with its transmission, 17 U.S.C. § 101. Defendants assert, therefore, that the fixed signal that was copyrighted was the dirty signal. As defendants intercepted and played the clean signal there was no infringement, as the clean signal was neither fixed nor copyrighted.
If defendants' argument is sound, copyright protection for all forms of live video and audio entertainment can be circumvented. It is obvious that the commercial success of live television entertainment depends substantially on advertising. Advertising is inserted at a network control point. Any live show, including football games, requires at least two satellite transmissions, one with a clean feed of the show itself to the control point and the other of the dirty feed including the show and commercials to broadcast stations. Therefore, any live show can be intercepted by anyone with the proper equipment by intercepting the clean feed, without commercials and then displaying this to customers or others. According to defendants, this is not a transgression of the rights of the copyright owners of those shows.
This Court cannot accept this proposition nor does it appear Congress ever intended this result.
The viewing and hearing public, principally by means of television and radio, enjoy sports, music, theatre and other programming because of the interest in those fields and not because of a desire to watch and listen to commercials and other network insertions. It is the aria from Puccini as sung by Pavarotti at Kennedy Center and the performance of Aida at the Metropolitan and the football game between the Cardinals and another team that the television viewers take delight in and not the inserted commercials. The fixation, therefore, is the "original `works' of authorship" which is the opera, the dance ensemble, the address and the game. The fact that the performance is replete with network commercial insertions does not so restructure the program as to make it a new original work or to give it a new or final fixation.
There is nothing in the legislative history of Chapter 17 U.S.C. that would suggest Congress intended a different interpretation. The Court therefore concludes that defendants' interception, divulgence and use of plaintiffs' satellite delivered programming and signals, whether such signals constitute so called clean feed transmissions or dirty feed transmissions violated plaintiffs' rights under the Copyright Act. 17 U.S.C. § 106(5), 111(b) and 501(a); National Football League and Miami Dolphins, Ltd. v. The Alley, Inc., American Embassy, Inc., et al., Case No. 83-0701-CIV-JWK (S.D.Fla., 1983); Entertainment and Sports Programming Network, Inc., et al. v. Edinburg Community Hotel, Inc., 623 F.Supp. 647 (S.D.Tex.1985).
This finding is not necessarily conclusive as to defendants Guttmann's and Sandrina's. Guttmann's does not now have a liquor license which authorizes beverage sales on Sundays when most of the Cardinals games are played. Guttmann's, therefore, is not open for business on Sundays and the Court finds this defendant has not infringed plaintiffs' copyright privilege as only three friends were present watching one of the games in question. While 17 U.S.C. § 106(4) and (5) provide that the owner of a copyright has the exclusive right to authorize the public performance and display of its copyrighted works, this would not preclude a display to three friends. A "public performance" is the *887 performance or display of a work to a substantial number of persons outside a normal circle of family or friends. 17 U.S.C. § 101. While Guttmann's, on the basis of the evidence now before the Court, has not violated plaintiffs' copyright privileges, it has the equipment available to do so which will be addressed when the question of injunctive relief is considered.
Defendant Sandrina's, although it too has the equipment, did not transgress plaintiffs' copyrights by intercepting a satellite signal. It did receive and show to its customers a broadcast of a game signal from a Cape Girardeau, Missouri located channel. Channel 12, KFVS T.V. is a CBS affiliate in a community 100 or more miles away and that affiliate has the permission from the network and plaintiffs to broadcast the game. Sandrina's received that channel broadcast by means of a T.V. antennae. Such an interception with T.V. antennae equipment commonly used by the public is not an infringement of plaintiffs' copyright authority.
Defendants, nevertheless, aver that they are exempt from copyright infringement under 17 U.S.C. § 110(5). That section of the code provides that a communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes is not an infringement of copyright. Defendants contend the dish type apparatus used by them is of a kind commonly used in private homes and they are, therefore, exempt.
The evidence does not support defendants' assertion. There are currently over 125,000,000 residential television sets in use. Home television users receive signals from network stations broadcasting the program and from cable. The common method of reception is by built-in antennae, rabbit ears or outside antennae.
There are less than 1,000,000 dish systems in use, and many of these are confined to commercial establishments. The dishes do have residential use when the home is so situated that access to television station broadcasting by standard television antennae is poor. Television sets can be purchased for $100.00 or more where as dish systems cost no less than $1,500.00 and for desired reception, $3,000.00 to $6,000.00 or more. The Court finds these systems are not the kind commonly used in private homes and defendants are not exempt from copyright infringement under 17 U.S.C. § 110(5). See also H.R.Rep. 94-1476 (Sept. 3, 1976), U.S. Code Cong. & Admin.News 1976, p. 5659.
In copyright infringement cases, "a copyright plaintiff is entitled to a permanent injunction where liability has been established and there is a threat of continuing violations." Universal City Studios, Inc. v. Sony Corporation of America, 659 F.2d 963, 976 (9th Cir.1981), rev'd on other grounds, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). The final injunction should be granted on such terms as the Court may deem reasonable to prevent or restrain infringement of the copyright. 17 U.S.C. § 502(a).
The evidence is clear, as stated even by some of defendants own representatives, that defendants intend to continue intercepting plaintiffs' satellite signal of football games and show them to their customers. There is even some convincing evidence that one or more defendants intercepted plaintiffs' signal and showed a game to customers after the issuance of the temporary restraining order.
Injunctive relief should not be granted unless there is a showing that plaintiffs' legal remedies are inadequate and without the relief plaintiffs would suffer irreparable harm. Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Although plaintiffs could sue defendants for statutory damages under the Copyright Act each time there is an infringement, such relief would be inadequate as it would produce a multiplicity of suits. The Cardinals play eight or more exhibition and regular season games at home per year. The evidence is that most of these home games are blacked *888 out. If these games are shown by defendants, it would require plaintiffs to bring as many suits for damages as there are games played.
As to irreparable harm, the Court finds that more persons attend the games if a televised showing is not available than if it is. A large live audience not only insures gate revenues, but enhances the marketability of television broadcasts, as well. While it is usually impossible to measure precise damages for copyright infringement, as is the case here, "a copyright holder in the ordinary case may be presumed to suffer irreparable harm when his right to the exclusive use of the copyrighted material is invaded." American Metropolitan Enterprises of New York, Inc. v. Warner Brothers Records, Inc., 389 F.2d 903, 905 (2nd Cir.1968); Cassidy v. Bowlin, 540 F.Supp. 901, 904 (W.D.Mo.1982).
The basic purpose of the Copyright Act is to afford protection for one who has legally registered his works. Permanent injunctive relief preventing infringement here is the only way plaintiff owners may be protected when defendant infringers threaten continued infringement. Accordingly, defendants and their agents and employees will be permanently enjoined from intercepting, receiving, appropriating, converting to their own use, or retransmitting, divulging or using any satellite-delivered transmissions of plaintiffs' programming or signals, or copyrighted works, or any satellite-delivered programs which plaintiffs make or could make available to the public through its contracts with the networks, without authorization from plaintiffs and whether such signals constitute clean feed or dirty feed transmissions.

Federal Communications Act
This act, originally known as 47 U.S.C. § 605 was redesignated by congress on October 30, 1984 as 47 U.S.C. § 705. Section 705 became effective December 30, 1984. The act sets out certain prohibited practices as unauthorized publications or uses of communication. The prohibited practices are identical in §§ 605 and 705. Section 705 contains provisions relating to exceptions, definitions and penalties that were not contained in § 605.
Both §§ 605 and 705 provide that "no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." Plaintiffs assert that when defendants intercepted their football game transmissions and showed them to their customers, they were in violation of the Act. Although, the Act was originally intended to prohibit radio and telegraph operators from disclosing the contents of a radiogram or a telegram, United States v. Sullivan, 116 F.Supp. 480 (D.C.1953), the prohibition has been expanded judicially to include modern technology. Movie Systems, Inc. v. Heller, 710 F.2d 492 (8th Cir.1983); Chartwell Communications Group v. Westbrook, 637 F.2d 459 (6th Cir.1980); Allen B. Dumont Laboratories v. Carroll, 184 F.2d 153 (3rd Cir.1950) cert. denied, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951).
Defendant Talaynas' contends that plaintiffs are using a law (§ 705), effective December 30, 1984, to apply retroactively to transactions occurring in the fall of 1984. Although, as stated, the December 30, 1984 law contained certain provisions as to definitions, penalties and remedies not contained in the previous law (§ 605), prior interpretations of § 605 found that aggrieved parties had private causes of action under § 605 for injuries arising from a violation of that section. Movie Systems, Inc. v. Heller, id. The occurrence of the alleged violations before December 30, 1984 do not therefore have ex post facto implications.
Defendants next contend that the prohibited practices shall not apply to the receiving, divulging, publishing or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public. Sections 605 and 705, id. As the satellite downlink, whether *889 clean or dirty, covers virtually the entire continental United States and as it can be intercepted by the one million or less users of dish antennae apparatus, defendants' contend plaintiffs' signal must be for the use of the general public as it has mass appeal and defendants' use thereof is thereby exempt.
It was held, however, in Movie Systems, Inc., that "the crucial factor in determining whether the programming is broadcasting for the use of the general public is not whether the content of the program has mass appeal or mass availability but rather, whether it was intended for the use of the general public." Id. 494. The Court finds here that even though the football game's signal may have mass appeal, plaintiffs intended, for obvious economic reasons, that the transmissions with advertising only be broadcast. As the clean feed signal without advertising, which defendants intercepted, was never intended by plaintiffs to be broadcast, it was not for the use of the general public. The sole purpose for the clean feed broadcast was to transmit this signal from satellite so that the network control point could receive it and insert the economically vital commercials. The methodology used by plaintiffs to transmit the clean feed signal to the network control point, which enabled those with dish antennae apparatus also to intercept the signal, does not alter plaintiffs' intent.
Defendants' main defense is that if there is an aggrieved party, it is the network rather than the program owners, because the owners are not the senders, originators or transmitters of the work. As the network is not a party to this suit, defendants claim these plaintiffs, as program owners, have no standing to assert violation of the Federal Communications Act.
The basis for defendants' position is the ruling in Air Capital Cablevision v. Starlink Communications, 601 F.Supp. 1568, (D.Kan.1985). That case involved a suit by two cable television companies against a distributor of earth station satellite dish antennae claiming unlawful interception of television signals transmitted via satellite in violation of the Federal Communications Act. Apparently, plaintiffs were cable television distributors, who by virtue of a license from a television producer, retransmitted for a fee to plaintiffs' customers, a select portion of satellite signals, such as HBO. There is no showing whether or not the producers or others owned the signals or were the senders, originators or transmitters of the signals.
Although there is some language in the case suggesting defendant was receiving the signals from a satellite signal, such as HBO, that plaintiffs had the license to retransmit, it appears that defendant mainly was a seller or distributor of earth station satellite dish antennae.
On summary judgment, the court ruled for defendant, stating plaintiffs have "no standing to claim violations under former § 605 of the Communications Act because the users of the earth station satellite dishes were not intercepting a transmission originated by or retransmitted by the cable company." Id. 1572. The court also ruled that defendants as sellers of dish antennae are not required to advise their customers that the equipment it sells could be used in violation of the law.
The court in Air Capital Cablevision attempted to distinguish its opinion from that of prior decisions. National Subscription Television v. S. & H.T.V., 644 F.2d 820 (9th Cir.1981); Chartwell Communications Group v. Westbrook, 637 F.2d 459 (6th Cir.1980); Porter County Cable Co., Inc. v. Moyer, No. S 82-172 (N.D.Ind.1983); Cablevision of Connecticut v. Long Island Wholesale Corp., et al., No. B 83-708 (D.Conn.1983); Movie Systems v. Heller, 710 F.2d 492 (8th Cir.1983); and United States v. Stone, 546 F.Supp. 234 (S.D.Tex.1982). Air Capital suggested these cases finding violations of former § 605 involve the rights of subscription television, cable television or other television programming distributors who either originated the satellite signal or received it and retransmitted it via its own or common carrier equipment, for which use the distributor *890 paid. The offending equipment intercepted or decoded television signals that were originated by or retransmitted by the programming distributor.
The court in Air Capital found that the defendant sellers of earth station satellite dish antennae do not intercept television signals originated by or retransmitted by the plaintiff's cable television companies nor do they hook into a cable company's telecommunication network and pirate away or decode the cable company's transmissions. Thus, Air Capital held, in effect, that the satellite dish seller defendant did not violate former § 605 of the Communications Act as the signal intercepted was not originated by or retransmitted by the plaintiff cable companies. The main basis for the court's ruling was the Congressional intent set out in the new act, § 705(b), effective December 30, 1984. The new Act provides that prohibited practices of communication interception shall not apply "to the interception or receipt by any individual ... of any satellite cable programming for private viewing" if the programming involved is not encrypted and a marketing program is not established. Id. § 705(b).
In the case at bar, the networks prepare and transmit the football game signals. Defendants maintain, therefore, that as plaintiffs are merely the owners of the work and are not the senders, originators or transmitters they have no standing to bring this case following the rationale of Air Capital Cablevision. This Court disagrees. Section 705(d)(3)(A) of the new Communication Act provides that "Any person aggrieved by any violation of subsection (a) of this section may bring a civil action in a United States district court...." In this subsection, Congress merely codified what had previously been held to be the law in at least three circuits in the construction of former § 605. Movie Systems, Inc. v. Heller, 710 F.2d 492 (8th Cir.1983); National Subscription Television v. S. & H. T.V., 644 F.2d 820, 821 n. 1 (9th Cir.1981); Chartwell Communications Group v. Westbrook, 637 F.2d 459, 466 and n. 5 (6th Cir.1980).
It is this Court's opinion that plaintiffs, as the copyright owners of the signal in this case, are "an aggrieved party" within the meaning of old § 605 and "any person aggrieved" as set out in § 705(d)(3)(A). Certainly this is in keeping with Senate floor debate on the § 705 amendment, when Senator Goldwater commented "Next, I wish to discuss the terms `any person aggrieved', `aggrieved party' and `party aggrieved' in § 705(d)(3), relative to civil actions. These terms may be broadly construed to include all those who own the rights in the programming being transmitted, as well as those who own the rights for satellite transmission. But, it does not include those entities which possess limited rights of reception and retransmission to the programming, such as cable systems and other purchasers of the right to receive it after satellite transmission." 98 Cong. Rec.S 14284 (daily ed. Oct. 11, 1984).
This construction should not do violence to the rationale of Air Capital Cablevision. Obviously, Senator Goldwater was reasoning, as did the court in Air Capital, that owners of a program and the sender come within the definition of aggrieved parties. An owner and a sender, therefore, may be the same or separate entities. But, cable systems and other program purchasers after satellite transmissions are not aggrieved parties and do not fall within the purview of § 705 or former § 605.
Plaintiffs, here, in addition to being the program owners, are the originators of the work. Plaintiffs cause the game to be played. They create the works of art which are the games. The networks simply provide the technical apparatus to place the game on a video system which ultimately can be broadcast by their affiliate stations. The networks, therefore, are the senders or the transmitters of the original works. It would stretch the constructive process to conclude that a sender or transmitter of an original works can only claim violation of the Communications Act while an originator of the works who is also the owner is barred from so doing. Plaintiffs, as the originators and owners of the program, *891 do have standing to assert the violations which are present in this case. Although the specific objections raised in this case have not been addressed in other reported cases, there is some authority supporting the conclusions set out here. See National Football League and Miami Dolphins, Ltd. v. The Alley, Inc., American Embassy, Inc., et al. and Entertainment and Sports Programming Network, Inc., et al. v. Edinburg Community Hotel, Inc., supra.

Damages
Although the Court finds that plaintiffs have and will suffer irreparable harm if defendants are not enjoined from intercepting plaintiff's program, a sufficient showing has not been made to warrant a finding of statutory damages under the Copyright Act. Statutory damages can be awarded for each infringement of the Act. 17 U.S.C. § 504(c)(1). The purported violations involve three separate games which were the Cardinal-Rams game of November 4, 1984, the Cardinal-Eagles game of November 25, 1984, and the Cardinal-Giants game of December 9, 1984. Notices of potential infringement were given by plaintiffs to defendants with respect to the November 25th and December 9th games thereby authorizing plaintiff to bring suit. 17 U.S.C. § 411(b). Defendants were barred from intercepting those game programs by temporary restraining order and preliminary injunction. Although there is some evidence, as noted before, of possible willfull violation of those orders by two defendants, the evidence is incomplete and the issue of violation of the Court's prior orders was not to be considered at this stage in any event. 17 U.S.C. § 504(c)(2). The Court finds, therefore, the evidence now available is insufficient to demonstrate a violation which would give rise to an award of statutory damages. The issue of the purported willfull violation of the Court's preliminary orders will be decided after further hearing at a later date.
Although defendants did infringe on plaintiff's copyright as to the game of November 4, 1984, the evidence is not conclusive that adequate notice was given by plaintiffs to defendants pursuant to the requirements of 17 U.S.C. § 411(b). The Court finds, therefore, that no award of statutory damages under the Copyright Act should be awarded plaintiffs as to the three games in question.
The foregoing constitutes findings of fact and conclusions of law as required by rule.

ORDER
In accordance with Memorandum Opinion which will be entered by the Court within ten days from the date of this Order,
IT IS HEREBY ORDERED that plaintiff shall be granted leave to amend their complaint by interlineation as requested in motion filed March 14, 1985 and to conform to the evidence as moved on May 17, 1985.
IT IS FURTHER ORDERED that defendants' interception, divulgence and use of plaintiffs' satellite-delivered programming and signals, whether such signals constitute so called clean feed transmissions or dirty feed transmissions, violated plaintiffs' rights under the Copyright Act, 17 U.S.C. § 101 et seq., and the Federal Communications Act of 1934, as amended, 47 U.S.C. § 151 et seq.
IT IS FURTHER ORDERED that defendants and its partners, subsidiaries, affiliates, officers, agents, representatives, servants, employees, privies and all persons in active concert and participation with them are permanently enjoined from:
1. Intercepting, receiving, appropriating, converting to their own use, or retransmitting, divulging or using any satellite-delivered transmissions of plaintiffs' programming or signals, or any satellite-delivered programming which plaintiffs make or could make available to the public through its contracts with ABC, CBS and NBC, *892 without authorization from plaintiffs and whether such signals constitute so called clean feed transmissions or dirty feed transmissions;
2. Assisting, aiding, abetting or conspiring with any person to intercept, receive, appropriate, convert, or retransmit, divulge or use plaintiffs' programming or signals without their authorization whether such signals constitute so called clean feed transmissions or dirty feed transmissions;
3. Intercepting, receiving, appropriating, converting to its own use, or retransmitting or using any copyrighted works or programming transmitted in plaintiffs' satellite transmissions without their authorization; and
4. Assisting, aiding, abetting or conspiring with any person to intercept, receive, appropriate, convert or retransmit, divulge or use plaintiffs' copyrighted works, programming or signals transmitted by satellite, without their authorization.
IT IS FURTHER ORDERED that judgment shall be entered for the defendants as to the request for statutory damages under the copyright act and no statutory damages shall be awarded.
IT IS FURTHER ORDERED that defendants' motion to strike shall be DENIED.
IT IS FURTHER ORDERED that the issues involving the counterclaim, the request for citations for contempt and damages and attorneys' fees and any other pending motion not rendered moot by this order shall be set for trial on November 25, 1985. The regular pre-trial order of this Court shall be applicable for that hearing.
IT IS FINALLY ORDERED that while this judgment and order shall be in full force and effect from date it shall not be final for the purposes of calculating time requirements for post trial motions or appeal until the memorandum opinion is entered.
Dated this 13th day of September, 1985.