792 F.2d 726
 55 USLW 2022, 230 U.S.P.Q. 30, 1986
Copr.L.Dec. P 25,941,
12 Media L. Rep. 2265
 NATIONAL FOOTBALL LEAGUE and St. Louis Football Cardinals,
Inc., Appellees,
v.
McBEE & BRUNO'S, INC.; Jerrald Guttmann; Michael
Badalamenti; Frank & Frank, Inc.; and Talayna's
of South St. Louis, Inc., Appellants.
 Nos. 84-2665, 85-1199 and 85-2350.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 16, 1986.
Decided June 4, 1986.
Rehearing Denied July 1, 1986.
 
 John L. Sullivan, St. Louis, Mo., for appellants.
 John Vanderstar, Washington, D.C. and Robert E. Wallace, St. Louis, Mo., Rebuttal by Barry Ginsburg, St. Louis, Mo., for appellees.
 Before HEANEY, ARNOLD, and WOLLMAN, Circuit Judges.
 ARNOLD, Circuit Judge.
 
 
 1
 This lawsuit, brought by the National Football League (NFL) and the St. Louis Football Cardinals (Cardinals), alleges that defendants, the owners of several St. Louis restaurants, violated federal copyright and communications law by showing Cardinals' home games which had been "blacked out" in the St. Louis area. According to plaintiffs, defendants picked up the signals for such games by means of satellite dish antennae. The District Court,[1] which had already issued a temporary restraining order and a preliminary injunction, entered a permanent injunction against defendants after a trial on the merits. NFL v. McBee & Bruno's, 621 F.Supp. 880 (D.Mo.1985). The decision was based on the Copyright Act of 1976, 17 U.S.C. Sec. 101 et seq., and the Federal Communications Act, Sec. 705 (formerly Sec. 605). In the main, we affirm.
 
 I.
 
 2
 The Cardinals, a professional football team, is one of 28 teams composing the NFL, an unincorporated non-profit association through which the member clubs schedule games and manage their affairs as a group, including contracts with the three major television networks. One provision of those television contracts is that games which are not sold out within 72 hours of game time are to be "blacked out," that is, not broadcast within a 75-mile radius of the home team's playing field. Officials of the league and club testified at trial that such a rule boosts team revenue directly by increasing ticket sales and indirectly because a full stadium contributes to a more exciting television program and therefore makes the right to broadcast games more valuable.
 
 
 3
 Witnesses also described the process by which a live football game is telecast by the networks, in this case CBS. As television cameras capture the visual portion of the game, announcers describe and discuss the action from a sound booth of some kind. Those simultaneous audio and video signals are combined at an earth station outside the stadium. This signal--called an uplink--is transmitted up to a satellite, which then sends the signal back--called a downlink--to a network control point on Long Island. Because that signal contains no images other than those from the stadium, this stage is referred to as a "clean feed." The signal is then sent by cable to CBS studios in New York; commercials and other interruptions, such as station breaks, are inserted, and it is now described as a "dirty feed." There is another uplink to the satellite, and then a downlink to local affiliates, who insert local material and finally put the live broadcast on the air. The process apparently takes far longer to describe than to occur; at argument, counsel for the NFL called the procedure "simultaneous, instantaneous," and said that the delay between the action on the field and the broadcast by local affiliates was considerably less than two seconds.
 
 
 4
 The defendants are owners, corporate or individual, of St. Louis bar-restaurants within 75 miles of Busch Stadium, the Cardinals' home field. All defendants have satellite dish antennae that enable them to receive transmissions in the so-called C-band frequency, approximately 3200-4200 megahertz, in which the satellite sends and receives transmissions.[2] There is no question that prior to November 19, 1984, all defendants but two[3] picked up the clean feed (from the satellite to CBS) and thereby showed blacked-out home games of the Cardinals. On that date, plaintiffs requested and the District Court entered a temporary restraining order, preventing defendants from intercepting and showing the home game scheduled for the following Sunday; after a hearing, the Court issued a preliminary injunction in basically the same terms, dealing with the last home game of the season. Trial on the merits was held on May 7, 1985. The District Court found that the telecasts were copyrightable under Section 102 of the Copyright Act, that the plaintiffs were owners of those copyrights, and that display of the clean feed transmissions of those telecasts violated plaintiffs' exclusive right of display and performance under Section 106 of the Act, as well as Section 705 of the Communications Act. A permanent injunction issued on September 13, 1985, prohibiting the defendants from intercepting and showing plaintiffs' programming, whether in the form of the clean or dirty feed transmissions.
 
 II.
 
 5
 The owners of the defendant restaurants challenge the District Court's Copyright Act decision on a variety of grounds: that the evidence presented by plaintiffs to show irreparable injury was too speculative to support the issuance of a permanent injunction; that defendants' display of blacked-out home games falls under statutory limitations on exclusive rights of a copyright owner, 17 U.S.C. Sec. 110(5); that defendants did not infringe on plaintiffs' copyright because they intercepted the clean feed rather than the dirty feed, which was the transmission actually "fixed" under the Copyright Act and registered with the Copyright Office; and that under 17 U.S.C. Sec. 411, no permanent injunction can issue concerning works which are not already in existence. Although some of these arguments have more substance than others, we consider all to be ultimately without merit.[4]
 
 A.
 
 6
 Defendants first allege that plaintiffs have not shown that either the League or the local team will suffer the sort of irreparable injury necessary to justify a permanent injunction. Instead, say the restaurant owners, the plaintiffs' evidence is mere "bluster," Appellants' Supplemental Brief at 5, insufficient to make out a claim of copyright infringement under Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 104 S.Ct. 774, 78, L.Ed.2d 514 (1984), which they say requires factual evidence of harm.
 
 
 7
 Defendants have read Sony too broadly. Copyright law has long held that irreparable injury is presumed when the exclusive rights of the holder are infringed. See, e.g., American Metropolitan Enter. of New York, Inc. v. Warner Bros. Records, 389 F.2d 903, 905 (2d Cir.1968). The only limitation Sony placed on that principle was to require that if the unauthorized use of copyright material "is for a noncommercial purpose, the likelihood [of future harm] must be demonstrated." 464 U.S. at 451, 104 S.Ct. at 793. However, "[i]f the intended use is for commercial gain, that likelihood may be presumed." Id. The record in this case clearly shows that defendants did far better business on those days when they exhibited the blacked-out Cardinals' games, Tr. 102,[5] and the District Court so found. 621 F.Supp. at 885. Any claim that Sony changes the standard of proof required under these circumstances is simply incorrect.
 
 
 8
 Although the District Court recognized this presumption of irreparable harm, id. at 888, it also stated "that more persons attend the games if a televised showing is not available than if it is," id.; noting that a full stadium translates into greater ticket sales and a more exciting--and therefore more marketable--television entertainment program. This finding is not clearly erroneous, nor is it contradicted by Malrite TV of New York v. Federal Communications Comm'n, 652 F.2d 1140 (2d Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982), cited by defendants for the proposition that the NFL and its member clubs have never been able to support their claim that the black-out rule protects their interests. That decision upheld changes by the FCC in the rules governing transmission of cable television signals and is inapplicable here for a variety of reasons: the standard of review was that used for agency rulemaking; the continuation of the home black-out rule was explicitly assumed; and no question of copyright infringement, with its presumption of injury, was raised.
 
 B.
 
 9
 Defendants' second and most considerable argument is that their display of plaintiffs' blacked-out games falls into the category of non-infringing acts under Section 110(5) of the Copyright Act. Under that provision, no copyright liability can be imposed for "communication of a transmission embodying a performance ... by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes...."[6] The District Court rejected this argument, finding that satellite dish antennae, which in the United States are outnumbered by television sets by more than 100-to-one, were outside the statutory exemption. 621 F.Supp. at 887.
 
 
 10
 According to the defendants, this ruling ignores their theory that how "the signal was captured by the antenna outside the premises" is "irrelevant," Appellant's Supplemental Brief at 6. Instead, they argue, the key to Section 110(5) is whether an alleged infringer uses commercial equipment to enhance the sound or visual quality of the performance as it is perceived inside the premises. "All published cases on Section 110(5) take this approach," defendants say, id. at 7 (emphasis in original). This interpretation ignores both the plain language of the statute and its obvious intent.
 
 
 11
 The home-use exemption was included in the 1976 Copyright Act specifically in response to the Supreme Court's decision in Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). Aiken held that the owner of a small fried-chicken restaurant was not "performing" copyright works when he played a conventional radio through four in-the-ceiling speakers for the benefit of customers and employees. According to the legislative history of the 1976 Act, an act such as Aiken's would be considered a performance; to decide whether an infringement had occurred, the critical question instead would be the type of equipment used by the putative infringer. Calling "the use of a home receiver with four ordinary loudspeakers ... the outer limit of the exemption," the drafters then said:
 
 
 12
 the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial 'sound system' installed or converts a standard home receiving apparatus ... into the equivalent of a commercial sound system.
 
 
 13
 H.R.Rep. No. 94-1476 at 87, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad. News 5659, 5701. Common sense alone says that it does not matter how well speakers amplify a performance if a receiver cannot pick up the signal in the first place. Moreover, both the legislative history and the plain language of the statute--which speaks of a "receiving set"--contemplate that how the signal is captured will be as much at issue under the exemption as how good the captured signal sounds or looks. There is no indication that the portion of a system which receives should be considered separately from that which displays.
 
 
 14
 The factors listed in the legislative history do speak of the size of the area where the transmission will be played and "the extent to which the receiving apparatus is altered ... for the purpose of improving the aural or visual quality of the performance," id. And it is true, as defendants argue, that most of the cases involving the Section 110(5) exemption deal with the enhancement factor, see, e.g., Rogers v. Eighty-Four Lumber Co., 617 F.Supp. 1021, 1022-1023 (W.D.Pa.1985); Sailor Music v. The Gap Stores, Inc., 516 F.Supp. 923, 924-925 (S.D.N.Y.), aff'd, 668 F.2d 84 (2d Cir.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). The reason, however, is that these cases have to do not with interception of blacked-out television programming, where the difficulty is in intercepting a signal, but with the playing of music for which no royalties have been paid. In this sort of case, the question as a practical matter is whether the defendant establishment is of the size and kind that Congress would expect to obtain a license through a subscription music service. See Sailor Music, 668 F.2d at 86; Springsteen v. Plaza Roller Dome, Inc., 602 F.Supp. 1113, 1119 (M.D.N.C.1985); H. Conf.Rep. No. 94-1733, 94th Cong., 2d Sess. 75, reprinted in 1976 U.S.Code Cong. & Ad. News 5810, 5816. In the present case, however, the NFL and Cardinals are not saying the bar owners can display their programs if a license fee is paid; these plaintiffs intend that their work not be performed at all outside their aegis, making the fact of reception rather than just its quality the primary consideration. The question in this instance, therefore, is how likely the average patron who watches a blacked-out Cardinals game at one of the defendant restaurants is to have the ability to watch the same game at home? If it is likely--that is, if such systems are the "kind commonly used in private homes"--then the Section 110(5) exemption applies.
 
 
 15
 However, as the District Court in this case stated:
 
 
 16
 There are less than 1,000,000 dish systems in use, and many of these are confined to commercial establishments. The dishes do have residential use when the home is so situated that access to television station broadcasting by standard television antennae is poor. Television sets can be purchased for $100.00 or more [while] dish systems cost no less than $1,500.00 and for desired reception, $3,000.00 to $6,000.00 or more.
 
 
 17
 621 F. Supp. at 887 (citation omitted).
 
 
 18
 Given these facts, the Court's finding that satellite dishes are not "commonly found in private homes" is not clearly erroneous. There was testimony that the number of such receivers has been growing rapidly, Tr., Preliminary Hearing (November 29, 1984), Vol. II at 104-105, and while some day these antennae may be commonplace, they are not now.
 
 C.
 
 19
 The Copyright Act protects "original works of authorship fixed in any tangible medium," 17 U.S.C. Sec. 102(a), including "motion pictures and other audiovisual works," 17 U.S.C. Sec. 102(a)(6). As for live broadcasts, such as the football games at issue here, the Act states that "[a] work consisting of sounds, images, or both, that are being transmitted, is 'fixed' ... if a fixation of the work is being made simultaneously with its transmission," 17 U.S.C. Sec. 101; "[t]o 'transmit' " is defined as "to communicate ... by any device or process whereby images or sounds are received beyond the place from which they are sent." Id. The defendants claim that no infringement took place because they intercepted the clean feed, and it was the dirty feed which was fixed under the Act and for which the plaintiffs sought copyright protection. In making the argument that the clean and dirty feeds represent separate works, defendants depend on the quoted definitions, as well as a third provision of Section 101 which states that each draft version of a work "prepared over a period of time," id., constitutes a separate work.
 
 
 20
 The District Court rejected this theory on two grounds. Not only could the argument rule out any protection for live broadcasting by satellite transmission but, the Court said, it also ignored the fact that the game, and not the inserted commercials and station breaks, constituted the work of authorship.
 
 
 21
 We agree. Plaintiffs testified copyright protection was obtained for "the game, the game action ... the noncommercial elements of the game." Tr. 11. More important, the legislative history demonstrates a clear intent on the part of Congress to "resolve, through the definition of 'fixation' ..., the status of live broadcasts," using--coincidentally but not insignificantly--the example of a live football game. H.R. 94-1476, 94th Cong., 2d Sess. 52, reprinted in 1976 U.S.Code Cong. & Ad. News 5659, 5665. We have already discussed the near-instantaneous nature of the picture's journey from stadium to viewer, ante at 728; Congress surely was aware that the images and sounds from a live broadcast do not go directly from camera or microphone to a home television or radio. To hold that this transmission process nevertheless represents the performance of separate works would gut the plain purpose of the "fixation" definition, as well as distort the concept of a "work prepared over a period of time."
 
 D.
 
 22
 Defendants' final argument is that, under Section 411(b) of the Copyright Act, the District Court could not issue a permanent injunction regarding works not yet in existence. This provision allows the copyright owner of a live broadcast to institute an action either before or after fixation only if the alleged infringer has received notice between ten and 30 days before the broadcast. By its terms, say defendants, this eliminates the possibility of permanent injunctive relief in the present case.
 
 
 23
 We disagree, and hold that permanent injunctive relief was an appropriate remedy in this situation. Defendants' argument reads Section 411(b) in a vacuum, ignoring the general grant of remedial authority in Section 502(a) of the Copyright Act, which permits a court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. Sec. 502(a). In copyright actions, courts traditionally have been willing to grant permanent injunctions once liability is established and a continuing threat to the copyright exists, Pacific & Southern Co., Inc. v. Duncan, 744 F.2d 1490, 1499 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985). The purpose of Section 411(b) was to protect live transmissions, H.R. Rep. No. 94-1476 at 157, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad. News 5773; it would subvert the Congressional goal to deny a permanent injunction in this case, where in addition to the danger of continued infringement, at 732, the notice requirement of Section 411(b) is met as a practical matter by the fact that plaintiff's home games are scheduled and the blackout decisions made on a well-known standard.[7]E.
 
 
 24
 Accordingly, permanent injunctive relief was appropriate as to the defendants McBee & Bruno's, Inc., Michael Badalamenti, and Talayna's of South St. Louis, Inc. Their violation of the Copyright Act fully supports the grant of such relief. As to these defendants, there is no need to discuss the District Court's holding that the Communications Act was also violated. All of the violations proved against them on this records were violations of the Copyright Act, at least, and we do not believe that either side in this case is concerned about anything these defendants might do in the future that would violate the Communications Act without also violating the Copyright Act.
 
 III.
 
 25
 The other two defendants, however, Jerrald Guttmann and Frank & Frank, Inc., have not violated the Copyright Act. See ante at 728 n.3. Nor has Frank & Frank, owner of Sandrina's bar and restaurant, done anything that even arguably violates the Communications Act, so far as we can tell. Customers watched the games as broadcast by the CBS affiliate in Cape Girardeau, Missouri, which is more than 75 miles from Busch Stadium. There was evidence that on December 9, 1984, approximately 45 persons watching the game upstairs in Sandrina's did view a signal captured by satellite dish, but the District Court made no finding to that effect, apparently not crediting this evidence. Plaintiffs concede that on the previous occasion, when Sandrina's picked up a game from Cape Girardeau, "it did not infringe a copyright or violate the Communications Act...." Supplemental Brief for Appellees 24. We therefore see no basis for permanent injunctive relief against Sandrina's, at least in the absence of further findings by the District Court, and the injunctive relief granted with respect to this defendant will be vacated.
 
 
 26
 The situation as to Guttmann's is somewhat different. There, a signal was received by satellite dish, but because only four people, including Guttmann and three friends, watched the game, no public performance in violation of the Copyright Act took place. The legal possibility remains open that this incident did involve a violation of the Communications Act. The key question is whether such an interception of the clean feed, on its way from St. Louis to Long Island by way of the satellite, was an unauthorized interception in violation of the Communications Act. We believe the special facts of the present case make it inappropriate for a court of equity to reach this issue. Guttmann's, as we have already noted, does not have a Sunday liquor license and is not open for business on Sundays, the day when most NFL games are played. It is conceivable that the owner and a few friends may gather again on an occasional Sunday and use the satellite dish, but even if they do so, no injury will result to plaintiffs different from the arguable injury they sustain from the few satellite dishes installed at private homes. This sort of injury has never been the focus of the present lawsuit, and there is no evidence that, standing alone, it would work a sufficient irreparable harm to justify injunctive relief. We therefore hold that it was not appropriate to enter permanent injunctive relief against Guttmann's, and the District Court's order will be vacated in respect of this defendant as well.
 
 
 27
 The fact that no injunction will be in effect against either Guttmann's or Sandrina's does not mean, of course, that either of these defendants will have a legal right to use its satellite dish to intercept the plaintiffs' clean feed for commercial purposes in violation of the black-out rule. On the contrary, we have held that such conduct violates the Copyright Act, and our declaration of the law in that respect establishes a rule of conduct binding on everyone who falls within its contours, whether an injunction is in effect or not. The only legal effect of vacating the injunctive relief as to Sandrina's and Guttmann's is that these defendants would not be subject to contempt sanctions if in the future they attempt to engage in the same copyright violations of which the other three defendants have been found guilty. If such violations do occur, plaintiffs are of course free to seek injunctive relief against Guttmann's and Sandrina's, and we have no doubt that the District Court would promptly grant it if a proper evidentiary showing is made.
 
 IV.
 
 28
 To summarize: the grant of permanent injunctive relief against the defendants McBee & Bruno's, Inc., Michael Badalamenti, and Talayna's of South St. Louis, Inc., is affirmed. The grant of permanent injunctive relief against defendants Jerrald Guttmann and Frank & Frank, Inc., is reversed.
 
 
 29
 It is so ordered.
 
 
 
 [1]
 The Hon. Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri
 
 
 [2]
 By contrast, the VHF or UHF frequencies used by local affiliates for public broadcasts are transmitted in frequency ranges of tens to hundreds of megahertz. Tr., Preliminary Hearing (November 29, 1984), Vol. II at p. 83
 
 
 [3]
 Defendant Jerrald Guttmann did use his satellite dish to intercept the blacked-out home game played on 4 November 1984. However, his establishment, Guttmann's, does not have a Sunday liquor license and is not open for business on Sunday; on that date, the bar was closed and the game watched only by Guttmann and three friends. The District Court found, NFL v. McBee & Bruno's, 621 F.Supp. 880, 886-87 (D.Mo.1985), and we agree, that such a viewing is not a public performance under Section 101 of the Copyright Act (defining public performance as a display "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered")
 The District Court also found that a second defendant, Frank & Frank, Inc., owner of Sandrina's, "although it too has the equipment, did not transgress plaintiffs' copyrights by intercepting a satellite signal." 621 F.Supp at 887. The Court found that customers at Sandrina's watched the games as broadcast by the CBS affiliate in Cape Girardeau, Missouri, which is more than 75 miles from Busch Stadium.
 Thus, on this record, defendants Guttmann and Frank & Frank, Inc., have not been shown to have violated the Copyright Act. If injunctive relief against them is to be upheld, it must be on the basis of the Communications Act. The special situation of these two defendants is discussed in Part III. of this opinion.
 
 
 [4]
 Defendants also argue that the District Court erred in refusing to honor their demand for trial by jury. Plaintiffs sought statutory money damages under the Copyright Act, and defendants were therefore, they say, entitled to trial by jury under the Seventh Amendment. Because the District Court awarded no damages, we need not address this argument
 
 
 [5]
 The owner of one of the defendant restaurants testified that when a blacked-out game was shown, he served 190 patrons, as opposed to 30 customers on a regular Sunday. Tr., Preliminary Hearing (November 29, 1984), Vol. II at p. 121
 
 
 [6]
 Section 110(5) provides that:
 Notwithstanding the provisions of Section 106 ["Exclusive rights in copyrighted works"], the following are not infringements of copyright:
 ... (5) communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes, unless--
 (A) a direct charge is made to see or hear the transmission; or
 (B) the transmission thus received is further transmitted to the public; ...
 
 
 [7]
 A similar theory involving future newscasts, was advanced and rejected in Pacific & Southern, supra; we agree with the Eleventh Circuit that a permanent injunction should be granted where "the registered work and the future works are so closely related, part of series of original works created with predictable regularity and similar format and function." 744 F.2d at 1499 n. 17